☐ Original     ☐ D

**CLERK'S OFFICE**
**A TRUE COPY**
Feb 12, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No.   **21-M-319 (SCD)** |
| Two Facebook Accounts Associated with John E. Postl ) | |
| Facebook.com/john.postl.5 and ) | |
| Facebook.com/john.postl.79 ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the    Eastern    District of    Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

    See attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2702 and 2711 and Federal Rule of Criminal Procedure 41;

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See attachment B.

       **YOU ARE COMMANDED** to execute this warrant on or before    2-26-21    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

       Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

       The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Hon. Stephen C. Dries    .
*(United States Magistrate Judge)*

       ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

    ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    2-12-21 4:05 pm

*Judge's signature*

City and state:    Milwaukee, Wis            Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information between October 01, 2019 and present date

associated with the following Facebook pages:

- https://m.facebook.com/john.postl.5?pn_ref=friends_search

   (Facebook page of John POSTL)

- https://m.facebook.com/john.postl.79?pn_ref=friends_search

   (Facebook page of John POSTL)

That are stored at premises owned, maintained, controlled, or operated by

Facebook, a social networking company headquartered in Menlo Park, California.

**ATTACHMENT B**
**Particular Things to be Seized**

Evidence related to the violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(g) (possession of firearm by prohibited person), 18 U.S.C. § 922(d) (sale or transfer of firearm to a prohibited person), 18 U.S.C. § 922(a)(6) (false statement as to material fact to FFL), 21 U.S.C. § 841 (a)(1) (manufacture, dispense, disperse a controlled substance), 26 U.S.C. § 5861(c) (receipt or possession of firearm made in violation of NFA), and 26 U.S.C. § 5861(d) (illegal to possess of an unregistered firearm), which are found in any of the following items of evidence:

**Information to be disclosed by Facebook**

1.      To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

2.      All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

3.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

4.      All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

5.      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

6.      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

7.      All "check ins" and other location information;

8.      All IP logs, including all records of the IP addresses that logged into the account;

9.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

10.       All information about the Facebook pages that the account is or was a "fan" of;

11.       All past and present lists of friends created by the account;

12.       All records of Facebook searches performed by the account;

13.       All audio messages sent by the account and messages received by the account;

14.       All video messages sent by the account and to the account;

15.       Any and all location data that is recorded by Facebook related to the account

16.       All information about the user's access and use of Facebook Marketplace;

17.       The types of service utilized by the user;

18.       The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

19.       All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

20.       All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of evidence of violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26 U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26 U.S.C. § 5861(d) (Possession of Unregistered NFA), 26 U.S.C. § 5861(e) (Transferring Firearm in Violation of NFA), 26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. § 5861(i) (Possession of NFA without a Serial Number), and 18 U.S.C. § 371 (conspiracy), and 18 U.S.C § 924(c) (possession of a firearm during the commission of a drug trafficking crime)

    a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

    b. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    c. Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

    d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

f. Based on the forgoing, I request that the Court issue the proposed search warrant based on the aforementioned facts.



CLERK'S OFFICE
A TRUE COPY
Feb 12, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of       )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*    )
         )
Two Facebook Accounts Associated with John E. Postl   )
Facebook.com/john.postl.5 and    )
Facebook.com/john.postl.79    )

Case No.   **21-M-319 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2702 and 2711 and Federal Rule of Criminal Procedure 41;

located in the  _____ District of  _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  ☑ evidence of a crime;

  ❒ contraband, fruits of crime, or other items illegally possessed;

  ☑ property designed for use, intended for use, or used in committing a crime;

  ❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:371; 18:922(g); 18:922(d); 18:922(a)(6), 21:841(a)(1); 26:5861(c); 26:5861(d) | Conspiracy; Possession of firearm by prohibited person; sale or transfer of firearm to prohibited person; false statement as to material fact to FFL; as well as other violations more thoroughly described in the affidavit attached. |

The application is based on these facts:

See attached affidavit.

  ☑ Continued on the attached sheet.

  ❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
    18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

RYAN ARNOLD   Digitally signed by RYAN ARNOLD
Date: 2021.02.12 10:33:16 -06'00'

*Applicant's signature*

ATF SA Ryan Arnold

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:   2-12-21

*Judge's signature*

City and state:   *Milwaukee, Wis*

Hon. Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Arnold, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since April 2015. As an ATF Special Agent, I have participated in numerous investigations regarding the unlawful possession of firearms by convicted felons.  I have also conducted investigations related to the unlawful use of firearms, firearms trafficking, and arson.

3.      Prior to my employment with ATF, I was a Special Agent with the United States Secret Service (USSS) for approximately 5 years.  My duties included providing and planning dignitary protection, drafting and executing Federal search warrants,

investigating of organized fraud networks, counterfeit currency investigations, and other financial crime.

4.     Previous to my tenure with the USSS, I served as a police officer with the Chicago, Illinois, Police Department (CPD). During part of my career as a CPD Officer, I was assigned to the Organized Crime Division-Gang Enforcement Unit. My responsibilities included the investigations of street gangs, narcotics distribution, firearms violations, robbery, home invasions, operating in an undercover capacity, and the authoring and execution of search warrants.

5.     This affidavit is made in support of an application for a warrant to search John E. POSTL (DOB: 1979) Facebook account. The search will be for evidence associated with possible violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(g) (possession of firearm by prohibited person), 18 U.S.C. § 922(d) (sale or transfer of firearm to a prohibited person), 18 U.S.C. § 922(a)(6) (false statement as to material fact to FFL), 21 U.S.C. § 841 (a)(1) (manufacture, dispense, disperse a controlled substance), 26 U.S.C. § 5861(c) (receipt or possession of firearm made in violation of NFA), and 26 U.S.C. § 5861(d) (illegal to possess of an unregistered firearm).

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

7.      The Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATIONS TO BE SEARCHED

Facebook Accounts associated with John  POSTL:

- https://m.facebook.com/john.postl.5?pn_ref=friends_search

- https://m.facebook.com/john.postl.79?pn_ref=friends_search

8.      The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## PROBABLE CAUSE

9.      Your Affiant learned of possible violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(g) (possession of firearm by prohibited person), 18 U.S.C. § 922(d) (sale or transfer of firearm to a prohibited person), 18 U.S.C. § 922(a)(6) (false statement as to material fact to FFL), 21 U.S.C. § 841 (a)(1) (manufacture, dispense, disperse a controlled substance), 26 U.S.C. § 5861(c) (receipt or possession of firearm made in violation of NFA), and 26 U.S.C. § 5861(d) (illegal to possess of an unregistered firearm).

10.      On January 23, 2021, Affiant interviewed a confidential source, herein referred to as CS1, at the Waushara County Sheriff's Office (WCSO) located at 430 E. Division Street, Wautoma, WI.  CS1 was incarcerated at the time for retail theft and a

warrant for failure to appear. CS1 expressed that he wanted to disclose information regarding illegal narcotics sales, illegal firearms possession, and the manufacture and possession of homemade pipe bombs by John E. POSTL.

11.    A review of the criminal history of John E. POSTL revealed the following convictions:

- WI Statute (943_20(1)(A)(3)(A)) – Theft - misdemeanor (07/29/1997)

- WI Statute (946_41(1)) – Resisting an Officer – misdemeanor (10/18/2000)

- WI Statute (940_19(1)) – Battery – misdemeanor (05/14/2002)

- WI Statute (948_61(2)(A)) – Possess Dangerous Weapon at School – misdemeanor (01/12/2007)

- WI Statute  (940_19(1)) – Battery - Party To (939_05): – misdemeanor (03/12/2009)

- WI Statute (941_23) – Carrying a Concealed Weapon – misdemeanor (09/14/2009)

- WI Statute (961_41(3G)(AM)) - Possession of Schedule I and II Narcotic – FELONY (04/22/2010)

- WI Statute (961_41(3G)(E)) – Possession of THC – misdemeanor (04/22/2010)

12.    POSTL's convictions remain of record and unreversed.

13.    For several reasons, law enforcement believes CS1 is reliable and credible. First, CS1 has provided information in the past that was independently corroborated by

the Waushara County Sheriff's Office (WCSO). In May 2019, CS1 provided information regarding a drug dealer in the Wautoma area. The information was corroborated by law enforcement and a short-term investigation was initiated. In that investigation, CS1 conducted recorded telephone calls to capture critical evidence of drug trafficking. Following the recorded calls, CS1 participated in the controlled buy of narcotics at the direction of WCSO that resulted in an arrest and felony conviction. For this past cooperation, CS1 received approximately $100 for his/her assistance. The information provided by CS1 to the Affiant has also been corroborated through independent investigation, surveillance, and information from other sources when possible. Secondly, to the Affiant the source also made current statements that are against his/her penal interests, in that the CI has admitted his/her involvement in assisting in the manufacture of illegal "zip guns" and purchasing narcotics. Finally, for the current information provided to the Affiant, CS1 did not ask for any consideration for his/her information and none was provided by law enforcement. CS1 is a convicted felon a has been convicted for the following violations:

- Wisconsin State Statute (943.41(5)(D)(1) – Credit Card Fraud – FELONY (02/26/1996)

- Wisconsin State Statute (943.10(1)(A) – Burglary with (939_05) Party to a Crime - FELONY (01-14-2005)

- Wisconsin State Statute (943.10(1)(A) – Burglary – FELONY (07/29/2014)

- Ohio state statute 2913.02 – Theft – misdemeanor

- Wisconsin State Statute (943.20(1)(A)(3)(A)) – Theft (04/06/1993)

- Wisconsin State Statute (943_20(1)(D)) Theft False Representation, (939.62) with habitual criminality – misdemeanor (11/02/1999)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property – misdemeanor (12/11/2003)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property with (939.62) Habitual Criminality – misdemeanor (04/25/2005)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property with (939.62) Habitual Criminality – misdemeanor (04/15/2013)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property with (939.62) Habitual Criminality – misdemeanor (04/25/2005)

-

- Wisconsin State Statute Criminal Damage to Property, (450.11 (7)(A) with (939.62)(2) Habitual Criminality – misdemeanor - (04/25/2005)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property with (939.62) (1)(A) Habitual Criminality – misdemeanor – (06/22/2005)

- Wisconsin State Statute (450.11 (7)(A) Obtain Prescription Drug with Fraud – misdemeanor – (02/09/2010)

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property – misdemeanor (04/23/2009) 2 counts

- Wisconsin State Statute (943.20(1)(A)) – Theft Movable Property with (939_05) (2 counts) Party to a Crime and (939.62) (2 counts) and (1)(A) Habitual Criminality – misdemeanor (02/26/2019)

14. On January 23 and 24, 2021, the following information was provided by CS1 to WCSO investigators.

15. CS1 explained that he lived with John E. POSTL at 433 E. Jackson Street, Ripon, WI, 54971 from approximately October 2019 to October 2020. CS1 said this was and still is POSTL's residence. CS1 was living with POSTL while he/she was hiding from police with an active warrant. He/she further explained that he/she was hiding there because he/she was waiting on a Social Security payment over $60,000 that would likely not occur if he was arrested.

**FIREARM POSSESSION**

16. CS1 stated that POSTL is a convicted felon who possessed firearms inside of 433 E. Jackson Street. The first night CS1 slept at POSTL's residence he/she found a .308 caliber rifle under the mattress of the bed. CS1 also saw POSTL with a disassembled .22 caliber rifle that belonged to POSTL's grandfather.

17. CS1 further explained that POSTL acquired at least two (2) new firearms during the time he/she lived with POSTL. These firearms were purchased by POSTL's wife, Emily POSTL (1989) ("Emily"), who purchased a shotgun and a .38 caliber snub nose revolver for John POSTL from pawn shops in Menasha, WI, and Oshkosh, WI, respectively. Emily purchased the shotgun for John POSTL after they received their tax

return money in 2020. CS1 observed POSTL with a box containing the shotgun (stock of the gun was visible) inside of 433 E. Jackson Street. Emily purchased the snub-nose .38 caliber revolver after they received their stimulus check for Covid19 relief (approximately April 2020). POSTL told CS1 that Emily purchased these firearms for him. CS1 last saw firearms inside of 433 E. Jackson Street on January 3 or 4, 2021.

## HOMEMADE FIREARMS

18.     CS1 advised POSTL began manufacturing homemade firearms that he/she referred to as "zip guns" during the time he/she lived at 433 E. Jackson Street. POSTL manufactured these firearms from metal piping, a stainless steel nail (firing pin), and parts from a sewing machine. CS1 assisted POSTL by disassembling sewing machines, however, he/she was unaware of what parts of the sewing machine were used to manufacture the firearm. In the summer of 2020, CS1 took POSTL to a patch of woods to test fire the first "zip gun" that POSTL manufactured. This gun appeared to be similar to a shotgun. POSTL left the vehicle and hiked into the woods while CS1 waited in the vehicle. CS1 heard a loud boom consistent with a shotgun blast. POSTL returned to the vehicle after and proclaimed the firearm worked. POSTL then manipulated the firearm in the car with a shotgun shell. This made the source nervous. POSTL continued to manufacture these devices after the test and possibly made as many as twenty. CS1 further explained POSTL rigged the firearms with a string that could be connected to a door, similar to a spring-gun trap. The manufactured firearms were capable of firing a 12-gauge shotgun shell or .308 rifle round. The manufactured

firearms would fire when the door was pulled open. CS1 never observed these devices set up as traps inside the residence. The manufactured firearms would fire when the door was pulled open. CS1 never observed these devices set up as traps inside the residence. CS1 saw these firearms inside of 433 E. Jackson Street while he resided there until October 2020. CS1 again saw the .308 rifle inside of 433 E. Jackson Street on or around January 3 or 4, 2021.

19. CS1 advised POSTL sometimes carries a firearm when he leaves the house but typically carries a machete. He also recently beat a man with a rubber mallet.

## PIPE BOMBS AND PROPANE TANK BOMBS

20. CS1 advised POSTL also manufactured PVC pipe bombs and gun powder-based bombs from propane empty propane tanks. POSTL's desire to manufacture these devices occurred after an encounter with the DC Eagles at their club house in Oshkosh, Wisconsin. The DC Eagles are a morotrcucle club. In the summer of 2020, CS1 went with POSTL and two other subjects to the DC Eagles club house to confront POSTL's cousin, Matthew SITTER. POSTL and SITTER claimed membership in the 21 Stone Bodysnatcher gang from Illinois. SITTER wanted to quit this gang and join the DC Eagles. POSTL and his associates entered the club to confront SITTER. POSTL was struck with a pistol and briefly knocked out. After POSTL regained composure, he talked to a member of the club known as "Two Chains" about the situation. "Two Chains" agreed SITTER could not merely quit a gang so they allowed POSTL and SITTER to fight in the basement of the clubhouse. POSTL keeps pictures of this fight on

his phone. POSTL still maintains animosity over the pistol whipping to this day and frequently talks about bombing the club house as revenge.

21.     CS1 advised POSTL began manufacturing PVC pipe bombs at his residence at 433 E. Jackson Street. POSTL showed CS1 a completed pipe bomb made of PVC pipe, gun powder, and masonry nails. The masonry nails were placed inside the PVC pipe and glued to the outside. CS1 advised that he would try to use an entire package of masonry nails per bomb. The items for the bombs were typically purchased from Menard's locations in Oshkosh, Appleton, and Fond du Lac. POSTL usually paid with Emily's Chime card. POSTL also accumulated scrap from Ripon Builders to manufacture pipe bombs.

22.     CS1 explained that POSTL also started manufacturing bombs from empty propane containers after the incident. POSTL would remove the valve portion of the container where the valve used to be. CS1 observed one completed bomb but observed between twenty and thirty empty propane containers. Additionally, POSTL had multiple containers of gun powder.

23.     CS1 said that POSTL became consumed with the idea of bombing the DC Eagles clubhouse and what methods to use to successfully complete the plan. CS1 explained that POSTL wanted to "level" the building. CS1 advised that there was a dry erase board in the basement of 433 E. Jackson Street where POSTL drew the floorplan of the clubhouse. The drawing remained permanently visible due to the type of marker he used to draw it.  Further, POSTL also kept a floor plan of the DC Eagles on his Lennova

laptop computer. POSTL also used Facebook messenger to communicate and often discussed illegal activity via this application.

24. CS1 last observed a completed bomb in POSTL's residence around October 2020.

25. On or around January 3 or 4, 2021, CS1 returned to 433 E. Jackson Street and met with POSTL to purchase 1/8 ounce of methamphetamine. CS1 entered the house to complete the transaction. Once inside, CS1 observed the aforementioned .308 rifle, propane tanks, and gun powder in the basement. He/she believed that from the materials he/she observed that POSTL was still manufacturing bombs. On January 6 CS1 was arrested for a warrant for failing to appear for a misdemeanor retail theft charge.

## DRUG SALES

26. CS1 advised he observed POSTL sell methamphetamines, THC cartridges, and dabs daily while he/she lived at 433 E. Jackson Street. POSTL sold methamphetamines to various customers. CS1 explained POSTL typically took the methamphetamines to his customers so he would not draw attention to his residence. Additionally, CS1 purchased methamphetamines from POSTL 1 to 2 times per week after he/she moved out in October 2020. CS1 would purchase an 1/8 to half an ounce on each occasion until his/her arrest on or around January 6, 2021.

27. POSTL traveled to Iowa for his drug dealing. CS1 stated that on one occasion, POSTL was stopped by law enforcement with scales and empty bags that had

contained methamphetamine. A review of the Wisconsin Circuit Court website revealed POSTL was given a citation in Grant County, Wisconsin (2020FO000632) for possession of drug paraphernalia and found guilty on or around July 27, 2020.

28.     During the time CS1 resided with POSTL, he/she advised Ronald DREZDON also lived there. CS1 saw DREZDON sell approximately four to five ounces of methamphetamines per week from POSTL's residence. Wisconsin Circuit Court website shows DREZDON has open felony cases in Fond du Lac County for Bail Jumping and felony possession of THC. DREZDON no longer lives at 433 E. Jackson Street, however, until approximately January 8, 2021, DREZDON was still delivering methamphetamines on behalf of POSTL.

29.     On about January 5, 2021, POSTL called CS1 on his cellphone to find the whereabouts of Nick Cauley who lives at the apartments located at 1905 Evans Street, Ripon, WI. CS1 knows POSTL was enroute to provide methamphetamine to Cauley and called him to ensure he was present.

## HIDES & FORTIFICATIONS

30.     CS1 said that POSTL created many places to hide contraband to include drugs and gun powder. One such hide are fake sewer pipes in the basement that can be unscrewed to reveal drugs and gunpowder. POSTL also hides contraband and drugs in compartments in his pets' cages.

31.     CS1 said that there is a room in the back POSTL has made for a barricade. The door can hold 2x4 oak boards. In addition, there are holes that a firearm can shoot

through into other rooms. There is also a CCTV camera that looks into the adjacent room. The .308 rifle is commonly kept hanging on the wall in this room for use.

32.     CS1 said that POSTL also has a hidden compartment at the base of a kitchen cabinet.  This cabinet held the aforementioned .38 revolver.  The compartment is next to the stairs leading to the basement.

## CS2 CORROBORATION

33.     On January 13, 2021, Lake Winnebago Area Metropolitan Enforcement Group (LWAM) members met with a cooperating source (herein referred to as CS2) regarding illegal drug sales by John POSTL. CS2 was jailed at the time of the interview for charges related to the possession of methamphetamines, paraphernalia, possession of heroin, manufacture/delivery of heroin. CS2 said that he/she wanted to speak with law enforcement to receive consideration for charges related to the possession of methamphetamines, paraphernalia, possession of heroin, manufacture/delivery of heroin. During the debrief, CS2 mentioned he/she had relapsed and has been using methamphetamines. CS2 said that he/she was buying the methamphetamines from John POSTL at 433 E. Jackson Street. He/She has purchased meth from POSTL around 50 times in various increments. CS2 further explained POSTL also sells to employees at Alliance Laundry, which is located near 433 E. Jackson Street.  CS2 said employees walk from Alliance to POSTL's residence during shift changes and/or break times. CS2 advised POSTL had a long gun in the garage and a handgun in the house. CS2 also stated POSTL carries a machete with him when he leaves the house and mentioned that

he beat a guy with a rubber hammer recently. CS2 used methamphedamine everyday around January 1st and January 6th, 2021 with POSTL at 433 E. Jackson Street, Ripon, WI. POSTL and CS2 used methamphedamine three to five times per day. POSTL never made CS2 pay for the methamphedamine. CS2 advised POSTL picked up "eight balls" or 1/8 ounces of methamphedamine in Fond du Lac, WI. The 6th of January was the last time CS2 saw POSTL with illegal drugs. On January 1, 2021, CS2 saw a firearm stored in the garage between the wall and garage doors. He/she described the firearm as a small .38 revolver. He/she futher advised POSTL kept a firearm in the basement near his bed. January 1, 2021 was the last time CS2 observed POSTL's firearms.

34.     CS2 also mentioned that POSTL has people stay at 433 E. Jackson Street. One of those individuals is Ronald DREZDON who was selling anywhere to 4 to 5 ounces of methamphetamines per week. POSTL advised CS2 that DREZDON was selling the methamphedamine and was hiding from police. CS2 belives DREZDON remained at the POSTL's residence until December 2020. He/she also stated there is back hidden room where POSTL keeps guns and drugs.

35.     For several reasons, law enforcement believes CS2 is reliable and credible. First, CS2 has provided information that was independently corroborated by CS1. Secondly, CS2 made current statements that are against his/her penal interests, in that CS2 has admitted his/her involvement in purchasing methamphetamine from POSTL. CS2 is a convicted felon and was convicted for the following violations of Wisconsin State Statues:

- Wisconsin State Statute 943.20(1)(a) Theft of movable property with 939.05 Party to a Crime – FELONY (04/24/2012)

- Wisconsin State Statute 941.30(2) 2nd Degree Recklessly Endangering Safety – FELONY (04/24/2012)

- Wisconsin State Statute 961.41(3g) Possession of Methamphetamine with 939.05 Party to a Crime – FELONY (04/24/2012)

- Wisconsin State Statute 947.01 Disorderly Conduct with 968.075(1)(a) Domestic Abuse Modifier – Misdemeanor (02/03/2010)

- credit card fraud.

## POSTL'S CONNECTION TO THE RESIDENCE

36. Law enforcement verified that John E. POSTL resides at 433 E. Jackson St, Ripon, WI, 54971 through multiple means. CS1 and CS2 both advised that POSTL currently lives at the address. POSTL also lists 433 E. Jackson Street, Ripon, WI, 54971 on his driver's license. In POSTL's most recent criminal court case (2020-CM-000958, Fond du Lac County), the court listed his address as 433 E. Jackson Street, Ripon, WI, 54971.

## EXECUTION OF FEDERAL SEARCH WARRANT

37. On January 27, 2021, members of ATF and other law enforcement executed a federal search warrant at the residence of POSTL. Inside the house, agents recovered the following items of interests:

- Suspected Homemade Firearm, Basement Workshop

- Lennova Laptop Computer, Downstairs Laundry Bar Room

- Digital Scale with Powder Residue, Basement Workshop, Inventory Item

- Plastic Containers with Suspect Pyrodex, AKA gunpowder, Inventory

- Alcatel Cellular Phone, Basement Bedroom

- One (1) Round of Ammunition, Basement Workshop

- Three (3) 12 gauge Estate shotgun shell, one (1) 12 gauge Federal shotgun shell, and one (1) Fiocci Shotgun Shells, Basement Workshop Floor,

- Two (2) Roadflares, Basement Workshop
- Sawed Off Shotgun Barrel, Downstairs Stairway

- Suspected Firearm, Downstairs Workshop

- Pyrodex Powder, Basement Workshop

- Miscellaneous Ammunition and primers, Basement Workshop

- Single Rifle Round, Second Floor Living Room

- Single Rifle Round, Second Floor Living Room

- Six Rounds of Ammunition, Basement Workshop

- White Powder Substance – suspected methamphetamines from positive field test (preliminary weight of approximately 3.8 grams), Basement Workshop

- Miscellaneous (single round) Ammunition, Basement Workshop,

- Suspected Suppressor/Muffler/Heat Shield for Homemade Firearm, Basement Workshop,

- White Powder in Plastic Baggie – preliminary weight of approximately 38.1 grams, Basement Workshop (sent for further testing)

- Multiple Jewel Bags, Basement Workshop

- Multiple Jewel Bags with Funnel, Table in Basement near Bedroom

38.     SA Arnold knows from training and exepreince that scales and jewel bags are used in the packaging of illegal drugs. Further, Affaint knows that gun powder and road flares can be used in the manufacturing of homemade explosives. The homemade firearms were able to receive shotgun ammunition; however, these items will be sent to ATF laboratories for proper testing regarding their ability to function. Finally, POSTL is a convicted felon and he can not possess the above ammunition.

## USE OF FACEBOOK

39.     CS1 advised law enforcement that POSTL communicated with many people via Facebook messanger and this was his primary means of communication. These Facebook messenger communications included discussions of criminal activity including the making of or use of bombs and the possession of or making of firearms with POSTL. Additonally, the argument between POSTL and SITTER that resulted in the altercation with the DC Eagles was initiated via Facebook messenger.

40.     CS1 identified the following Facebook pages as belonging to POSTL and used to discuss criminal activity:

- https://m.facebook.com/john.postl.5?pn_ref=friends_search

  (Facebook page of John POSTL)

- https://m.facebook.com/john.postl.79?pn_ref=friends_search

  (Facebook page of John POSTL)

41.     CS2 advised LWAM officers that he communicated with POSTL via Facebook messenger, and he/she used Facebook messenger to purchased methamphetamines from POSTL approximately fifty (50). During an attempt to contact POSTL to purchase methamphetamines on January 13, 2021, CS2 initiated contact with POSTL via one of POSTL's Facebook pages.

## SUMMARY

42.     Your affiant preserved the above Facebook pages on approximately January 24, 2021. It is believed that this accounts contain evidence of crimes committed by POSTL. Further, your affiant knows that it is common for drug customers to contact suppliers after the execution of search warrants or arrest. Subsequently, affiant is asking for information until the date of signature.

43.     Your Affiant also knows that social media, cellphones, laptops, and other electronic devices are critical to drug dealers.

44.     Your Affiant also knows that social media, cellphones, laptops, and other electronic devices are critical to subjects who manufacture homemade firearms and explosives. It is common for suspects to use the internet to find "zip gun" designs and bomb recipes online. Further, drug dealers also use electronics to communicate with

their clients. CS1 also informed law enforcement that POSTL uses his computer and online social media sites, in particular Facebook, to further his criminal activity. It is believed these accounts will include evidence of evidence of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(g) (possession of firearm by prohibited person), 18 U.S.C. § 922(d) (sale or transfer of firearm to a prohibited person), 18 U.S.C. § 922(a)(6) (false statement as to material fact to FFL), 21 U.S.C. § 841 (a)(1) (manufacture, dispense, disperse a controlled substance), 26 U.S.C. § 5861(c) (receipt or possession of firearm made in violation of NFA), and 26 U.S.C. § 5861(d) (illegal to possess of an unregistered firearm).

## ELECTRONICS IN FIREARMS TRAFFICKING & DRUG ORGANIZATIONS

42.     Affiant knows from training, experience, and this investigation that electronics are critical to the function of firearm and drug traffickers. Throughout this investigation, communications using a wide variety of electronic platforms have facilitated logistics of firearms and drug trafficking. These communications are interstate and international in nature. The platforms include email, internet gun brokering sites that allow the user to communicate, social media, and associated cellular phone applications, and cellular phones. The majority of these communications can be accessed via cellular phone, computer, tablet, or any electronic device that can communicate over the internet. Such evidence includes photographs of trafficked firearms, photographs of illegal drugs, photographs of wire transfers for firearms transactions, conversations regarding the trafficking of firearms and drugs and

conspirator identifications, and statements regarding personal drug use. Your Affiant believes the following affidavit will show how electronic communications and electronic devices are critical to the interstate trafficking of narcotics and firearms.

## SIGNIFICANCE OF FACEBOOK TO THE FIREARM TRANSACTIONS

43.     ATF agents know that Facebook accounts store communications and pictures that will assist the agents in making connections to people and places involved in the suspected conspiracy to traffic firearms and narcotics.

## FACEBOOK INFORMATION GENERALLY

44.     Facebook information Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

45.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

46.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

47.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

48.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also

post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

49. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

50. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that

allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

51.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

52.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

53.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

54.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

55.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

56.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

57.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

58.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

59.     Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

60.     Facebook uses the term "Neoprint" to describe an expanded view of a

given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

61. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

62. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or

complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

63. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to

understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

64. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## TECHNICAL TERMS

65. Based on my training and experience, I use the following technical terms to convey the following meanings:

66. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

67.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## REQUEST FOR SEALING

68.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information between October 01, 2019 and present date

associated with the following Facebook pages:

- https://m.facebook.com/john.postl.5?pn_ref=friends_search

  (Facebook page of John POSTL)

- https://m.facebook.com/john.postl.79?pn_ref=friends_search

  (Facebook page of John POSTL)

That are stored at premises owned, maintained, controlled, or operated by

Facebook, a social networking company headquartered in Menlo Park, California.

**ATTACHMENT B**
**Particular Things to be Seized**

Evidence related to the violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(g) (possession of firearm by prohibited person), 18 U.S.C. § 922(d) (sale or transfer of firearm to a prohibited person), 18 U.S.C. § 922(a)(6) (false statement as to material fact to FFL), 21 U.S.C. § 841 (a)(1) (manufacture, dispense, disperse a controlled substance), 26 U.S.C. § 5861(c) (receipt or possession of firearm made in violation of NFA), and 26 U.S.C. § 5861(d) (illegal to possess of an unregistered firearm), which are found in any of the following items of evidence:

**Information to be disclosed by Facebook**

1.  To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

2.  All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

3. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

4. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

5. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

6. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

7. All "check ins" and other location information;

8. All IP logs, including all records of the IP addresses that logged into the account;

9. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

10.     All information about the Facebook pages that the account is or was a "fan" of;

11.     All past and present lists of friends created by the account;

12.     All records of Facebook searches performed by the account;

13.     All audio messages sent by the account and messages received by the account;

14.     All video messages sent by the account and to the account;

15.     Any and all location data that is recorded by Facebook related to the account

16.     All information about the user's access and use of Facebook Marketplace;

17.     The types of service utilized by the user;

18.     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

19.     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

20.     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of evidence of violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26 U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26 U.S.C. § 5861(d) (Possession of Unregistered NFA), 26 U.S.C. § 5861(e) (Transferring Firearm in Violation of NFA), 26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. § 5861(i) (Possession of NFA without a Serial Number), and 18 U.S.C. § 371 (conspiracy), and 18 U.S.C § 924(c) (possession of a firearm during the commission of a drug trafficking crime)

      a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes;

      b. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

      c. Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

      d. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

e.  The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.

f.  Based on the forgoing, I request that the Court issue the proposed search warrant based on the aforementioned facts.